George Washington O'NEAL, Jr.; Cynthia Diana O'Neal; Gale Elaine O'Neal a/k/a Gail Elaine O'Neal; and Sharod Montes O'Neal, Plaintiffs,

v.

DeKALB COUNTY, GEORGIA; F.D. Hand, Jr.; Robert T. Burgess, Sr.; Donald E. Farrar; R.E. Roseberry; S.W. Waits; Georgia Osteopathic Hospital, Inc. d/b/a Doctors Hospital, Defendants.

Civ. A. No. C85–4643A.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 15, 1987.

James W. Howard, R. David Ware and Charles R. Floyd, Atlanta, Ga., for plaintiffs.

Judson Graves and Paul J. Quiner, Alston & Bird, Atlanta, Ga., Albert Sidney Johnson, Decatur, Ga., Wade H. Watson, III, Atlanta, Ga., for defendants.

ROBERT H. HALL, District Judge.

Plaintiffs bring this 42 U.S.C. § 1983 civil rights action seeking monetary damages. Federal jurisdiction is predicated upon 28 U.S.C. §§ 1331 and 1343. Plaintiffs also invoke this court's pendent jurisdiction to

consider their state law claims for wrongful death and medical malpractice. The action is currently before the court on defendants' motions for summary judgment.

**FACTS**

The following facts are not disputed by the parties:

Plaintiffs are the sole surviving legitimate and lawful children of George Washington O'Neal, Sr. ("O'Neal" or "decedent") who was not married at the time of his death. Plaintiffs' Complaint ¶¶ 5, 6. At the time of the incident which gives rise to this action defendant Hand was the Director of Public Safety of Defendant DeKalb County, defendant Burgess was the Chief of Police of DeKalb County and defendant Farrar was the Assistant Chief of Police of DeKalb County in charge of the Uniformed Division. *Id.*, ¶ 8; Affidavits of Donald E. Farrar, R.T. Burgess, Sr. and F.D. Hand, Jr. At all times material to this action, defendants Waits and Roseberry were police officers, employees of defendant DeKalb County, under the supervision and direction of defendants Hand, Burgess and Farrar. Complaint, ¶ 10. Defendant Georgia Osteopathic Hospital ("Doctors Hospital") is incorporated in the State of Georgia and, at the time material to this action, was treating the decedent who was registered as a patient at the Hospital. *Id.*, ¶ 11.

On December 12, 1983 O'Neal was admitted to Doctors Hospital complaining of headaches and severe pain in the right arm and jaw and numbness in the index and third fingers. O'Neal had previously been hospitalized at Doctors Hospital from November 22, 1983 through December 6, 1983 when he was diagnosed as having, among other things, degenerative joint disease, hypertension and diabetes. *See* Defendant Hospital's Brief in Support of Motion for Summary Judgment, Exhibit "A". Until late in the evening of December 14, 1983, the Hospital staff noted that O'Neal appeared to sleep well and showed no signs of distress. *See Id.*, "Nurses Progress Notes." Early in the morning of December 15, 1983, however, the nurses noted that O'Neal refused his medicine claiming it made him feel worse, complained of feeling short-winded, and appeared slightly confused. *Id.*

O'Neal was awake most of the night and in the morning his attending physician, Dr. Boecker, discontinued his medication and requested consultation by a Dr. Lara. Dr. Lara examined O'Neal on the afternoon of December 15, 1983 and found that, overall, O'Neal's confusional state was medication related and that he would do well over the next 48 hours after stopping all medicines. *Id.*, "Neurological Consultation." At 4:00 p.m. that day, the nurses noted that O'Neal's color was good and he showed no distress. At 6:00 p.m., however, O'Neal again appeared confused and was up walking in the room. The nurses progress notes reflect that at 10:00 p.m., O'Neal was in bed resting quietly with his eyes closed. *Id.* "Nurses Progress Notes."

Shortly after 10:00 p.m. on the evening of December 15, 1983, O'Neal, after calling for a nurse on the speaker box, jumped up from the chair in which he was sitting, grabbed a pocket knife from a bedside table and chased the nurse out of the room. O'Neal then stabbed another nurse who was standing at the nurses station and subsequently stabbed five other people on the floor. *See* Deposition of Daryle Branch, pp. 87–88; Police Report, Plaintiffs' Exhibit 1, Exhibit "A" to Plaintiffs' Supplemental Response Memorandum; Complaint, ¶ 14. During the incident, the hospital phoned the DeKalb County Police requesting help.

The first officer to arrive at the scene was defendant Waits. The officer went to the second floor where he saw O'Neal standing holding the knife at approximately waist level. Waits could not tell what kind of knife it was but noted that the blade was approximately 4 inches long. Deposition of Steven W. Waits, pp. 14–15 ("Waits Depo."). Waits raised his service revolver to O'Neal and ordered him to drop the knife and lie on the floor. O'Neal motioned for Waits to approach him and waved the knife back and forth in front of his face. *Id.*, p. 16. When Waits took a

step toward O'Neal, the latter turned and ran down a corridor of the hospital. *Id.*

When Waits ran down the hallway in pursuit of O'Neal he observed "a lot of blood on the floor ... a piece of intral of some kind" and a person on the floor who appeared to have a bad wound in his stomach. *Id.*, p. 54. After several minutes of pursuing O'Neal through the second floor corridors, Waits was backed-up by officer Roseberry who carried a shotgun. Upon his arrival, defendant Roseberry saw "blood all over the floor in just about the entire length of the hallway [and] what [he] believed to be intestines on the floor." Statement of R.E. Roseberry, Plaintiffs' Exhibit 2, Exhibit "B" to Plaintiffs' Supplemental Response Memorandum.

O'Neal was still running from Waits who continued to order O'Neal to stop and drop the knife. Finally, the two officers cornered O'Neal in an area of the floor where there appeared to be no bystanders. With their weapons raised, both officers repeatedly ordered O'Neal to drop the knife, surrender and lie on the floor. At one point O'Neal, who was turned toward Waits, began to lower the knife. Suddenly, however, he raised the knife, turned, and ran or walked quickly toward defendant Roseberry with the knife thrust in front of him. *See Id.*; Waits Depo., pp. 29–30. Both officers then fired their weapons at O'Neal. Although O'Neal was struck by both shots, he appeared to continue toward defendant Roseberry with the knife still raised. Roseberry then fired a second shot at O'Neal, whereupon O'Neal fell to the ground where he continued to wave the knife. Waits Depo., pp. 39–47.

Although defendant Waits called for help once O'Neal had fallen, O'Neal died as a result of the gunshot wounds. Plaintiffs do not dispute the facts surrounding the incident. The only fact they contend is in dispute is whether O'Neal, after being shot by both Waits and Roseberry, continued lunging toward Roseberry or whether he was actually falling in Roseberry's general direction. Plaintiffs, however, do not dispute that O'Neal had stabbed several people prior to the police arriving, that the

police pursued O'Neal ordering him to halt and drop the knife or that O'Neal turned and moved quickly toward Roseberry with the knife raised at waist or head level.

In Count I of their complaint, plaintiffs contend that defendants Waits and Roseberry were in a position to disarm O'Neal with a minimum of violence and bodily harm and that, instead, the officers, acting pursuant to DeKalb County policy and in accord with the training and supervision of the other defendants, used unreasonable and excessive force, depriving O'Neal of his life in violation of the Constitution. In Count II, plaintiffs claim that defendants Waits and Roseberry used excessive force against decedent thereby causing his wrongful death in violation of state law. In Counts III and IV, plaintiffs claim the defendant Hospital caused the decedent to become mentally irrational and failed to restrain him, causing his wrongful death and in violation of the Georgia medical malpractice statute, Ga. Off'l Code Ann. § 51–1–27 (1982). Defendants deny all liability and bring motions for summary judgment in their favor. Further facts will be disclosed as necessary for discussion of the motions.

## DISCUSSION

### I. *Plaintiffs' Section 1983 Claim*

Plaintiffs contend that defendants Waits and Roseberry used unreasonable and excessive force in attempting to apprehend and disarm O'Neal. They argue that DeKalb County and the supervisor defendants, Hand, Burgess and Farrar, are equally liable for defendants Waits' and Roseberry's conduct because the officers were acting in accordance with the customs, policies and practices of the county and the training and supervision of the supervisors.

42 U.S.C. § 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

The use of excessive or unreasonable force under color of state law may give rise to a cause of action under § 1983. *See e.g., Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Fundiller v. City of Cooper City,* 777 F.2d 1436 (11th Cir.1985); *Gilmere v. City of Atlanta,* 774 F.2d 1495 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986); *McQurter v. City of Atlanta,* 572 F.Supp. 1401 (N.D.Ga.1983) (Forrester, J.), *appeal dismissed,* 724 F.2d 881 (1984). Section 1983, however, does not itself create substantive rights. Rather, the court must look to determine whether plaintiffs have been deprived of a right secured by the Constitution and laws. *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). Defendants cannot be liable under section 1983 merely for the common law tort of wrongful death. Defendants' conduct must have been constitutionally tortious in order for plaintiffs to sustain their § 1983 cause of action.

In *Williams v. Kelley,* 624 F.2d 695 (5th Cir.1980) *cert. denied,* 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981), the former Fifth Circuit Court of Appeals stated that

> Section 1983 plaintiffs must prove both (1) deprivation of a federal constitutional or legal right which (2) resulted from "the sort of abuse of government power that is necessary to raise an ordinary tort by a government agent to the stature of a violation of the Constitution."

*Id.* at 697 (*quoting Turpin v. Mailet,* 579 F.2d 152, 169 (2d Cir.) (concurring opinion), *cert. denied,* 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662 (1978)) (citations omitted).[1] As the *Williams* court noted, a person's interest in life is clearly of constitutional dimen-

sion, thus, by proving O'Neal's death, plaintiffs have met their burden on the first prong of the inquiry. Plaintiffs must also prove, however, that "defendants' conduct—independent of its lawfulness or unlawfulness at state law—was sufficiently egregious as to be 'constitutionally' tortious." *Id.*

In the context of the instant action, determining whether defendants' conduct was constitutionally tortious depends upon the constitutional definition of unreasonable or excessive force. In *Tennessee v. Garner, supra,* the Supreme Court set forth the standard defining the reasonable use of deadly force within the meaning of the Fourth Amendment to the Constitution. The Court held that a statute allowing the use of deadly force would "pass constitutional muster" if applied in circumstances

> [w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others.... Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Tennessee v. Garner, supra,* 471 U.S. at 11–12, 105 S.Ct. at 1701.[2] Although the Supreme Court has not had occasion to define "unreasonable" or "excessive" force within the meaning of the Fourteenth Amendment due process clause, several circuit courts have applied a standard which is very similar to the standard defined by the *Garner* Court in the context of the Fourth Amendment.[3]

---

**1.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals held that all former Fifth Circuit cases submitted or decided prior to October 1, 1981 are binding precedent on this court.

**2.** The Eleventh Circuit Court of Appeals held that the *Garner* standard must be given retroactive effect. *Acoff v. Abston,* 762 F.2d 1543, 1549 (11th Cir.1985). Therefore, this constitutional rule applies to the conduct of defendants Roseberry and Waits on December 15, 1983.

**3.** Plaintiffs' complaint claims that O'Neal was deprived of his constitutional rights to life, equal protection of the laws and freedom from cruel and unusual punishment under the Fifth, Eighth and Fourteenth Amendments to the Constitution. In their briefs in response to defendants' motion for summary judgment, plaintiffs appear to assert that O'Neal's life was unreasonably seized in violation of the Fourth Amendment. Plaintiffs also concede in their response brief that their Eighth Amendment claim must fail as a matter of law. Because the determina-

The use of deadly force will not automatically constitute a constitutional tort. As noted above, use of deadly force does not violate the Fourth Amendment when used to prevent the escape of a suspect who has threatened an officer with a weapon or has committed a crime involving the infliction of serious physical harm on others. Similarly, the use of deadly force may not constitute a violation of the Fourteenth Amendment due process clause. The Eleventh Circuit Court of Appeals has adopted four factors for determining whether the use of deadly force constitutes a violation of the due process clause. Noting that "the violations which give rise to a substantive due process claim are necessarily more egregious than those which give rise to simple tort actions," the Eleventh Circuit quoted Judge Friendly:

> In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Gilmere v. City of Atlanta, supra,* 774 F.2d at 1500–1501 (*quoting Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

Reconciling these factors with the Supreme Court conclusion in *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), that substantive due process is violated by state conduct that "shocks the conscience" or constitutes force that is "brutal" and such as "to offend even hardened sensibilities," The Eleventh Circuit in *Gilmere* suggested that, for a defendant to be liable under § 1983, the facts must establish a constitutional violation sufficiently egregious to "shock the conscience." *Id.*

at 1501. This court believes that conduct is not sufficiently egregious to shock the conscience if it comports with conduct the Supreme Court has specifically stated is constitutionally permissible. If conduct is not unreasonable or unconstitutional as a matter of law under the Fourth Amendment, that conduct cannot be characterized as "brutal" or offensive to "even hardened sensibilities."

■ As a matter of law, an officer who uses deadly force against a person who threatens the officer or others with serious harm or who the officer has probable cause to believe has already inflicted serious harm on others does not thereby commit the *constitutional* tort of an unreasonable seizure or deprivation of life or liberty without due process. The use of deadly force by police officers in such circumstances is not, as a matter of law, unreasonable or excessive. See *Tennessee v. Garner, supra.*

■ Given the undisputed facts of this case that O'Neal stabbed several people before the police arrived, that the police ordered O'Neal to stop, surrender, and drop the knife thereby giving him several warnings, and that O'Neal moved quickly toward defendant Roseberry with his knife raised, the use of deadly force by Waits and Roseberry was not constitutionally unreasonable or excessive. Even if O'Neal had been moving toward Roseberry with the intent to escape rather than injure Roseberry, defendants Waits and Roseberry did not unconstitutionally use deadly force against O'Neal. Because Roseberry's and Waits' conduct was not constitutionally tortious, plaintiffs' Section 1983 claim must fail. Although plaintiffs have proved that O'Neal was deprived of a constitutional right, they have failed to show any specific facts that the deprivation of his rights resulted from an abuse of government power

tion of whether the use of deadly force constitutes a constitutionally tortious act in violation of either the Fourth or Fourteenth Amendment

requires application of nearly identical standards, the court proceeds on the assumption

which raises an ordinary tort to a violation of the Constitution.[4]

■ The Constitution allows police officers, when confronted with an incident such as that which gave rise to the instant action, to use deadly force. The only fact in dispute in this action is whether O'Neal was falling backwards or continuing to lunge toward defendant Roseberry at the time Roseberry fired the second shot. Regardless of O'Neal's position at that point, however, the officers were constitutionally permitted to use deadly force against O'Neal as soon as he moved toward Roseberry with his knife raised and in light of the officers' probable cause to believe O'Neal had inflicted serious injury on others (which facts are *not* in dispute). Contrary to plaintiffs' contentions, the Constitution does not require police officers to use a minimum of violence when attempting to stop a suspect from using deadly force against police officers or others. *See Tennessee v. Garner, supra; Gilmere v. City of Atlanta, supra,* 774 F.2d at 1502 (even weighty individual interest in one's own life may be counterbalanced by governmental interests in effective law enforcement). Because the undisputed facts in this case fail to support plaintiffs' claim under 42 U.S.C. § 1983, the court GRANTS defendants' motion for summary judgment as to Count I of plaintiffs' complaint.[5]

## II. *Plaintiffs' Pendent State Law Claims*

In Counts II–IV of their complaint, plaintiffs claim that defendants Waits and Roseberry and Doctors Hospital caused O'Neal's wrongful death and that defendant Hospital violated the state law prohibiting medical malpractice. This court can exercise jurisdiction over the plaintiffs state law claims solely by virtue of its having jurisdiction over plaintiffs' section 1983 claim. As detailed above, however, plaintiffs' section 1983 claim must fail as a matter of law and thus count I of plaintiffs' complaint must be dismissed.

Pendent jurisdiction is a doctrine of the trial court's discretion, not of plaintiffs' right. In *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court stated that if considerations of judicial economy and convenience and fairness to litigants are not present, a federal court should hesitate to exercise jurisdiction over state claims. The court further commented:

Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Id.* 383 U.S. at 726, 86 S.Ct. at 1139. Although the Eleventh Circuit recognized that *Gibbs* "strongly encourages or even requires dismissal of the state claims" if federal claims are dismissed before trial, it concluded that if the statute of limitations has run on a party's state claims, "dismissal of the state claims would be an abuse of discretion." *L.A. Draper & Son v. Wheelabrator—Frye, Inc.,* 735 F.2d 414, 428 (11th Cir.1984).

In the instant action plaintiffs filed their complaint two days before the statute of limitations had run on their wrongful death and medical malpractice claims. Georgia law provides for a two-year limitations peri-

---

that plaintiffs' claim is brought under both the Fourth and Fourteenth Amendments.

**4.** Once a movant has supported his motion for summary judgment, the adverse party "may not rest upon the mere allegations of his pleading," but in response "must set forth specific facts showing there is a genuine issue for trial." Fed. R.Civ.P. 56(e). In *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court held that, after adequate time for discovery, Rule 56(c) "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial." *Id.,* 106 S.Ct. at 2552–2553.

**5.** In light of the court's finding that defendants Roseberry's and Waits' conduct was not constitutionally tortious, the questions of whether or not the officers were following county policy or custom or whether there was an affirmative link between the supervisors' control and the officers' conduct are irrelevant. Even if the officers acted in accordance with county policy and their training, their conduct was not constitutionally infirm and, therefore, neither can the policy and training be considered violative of the Constitution.

od for such claims. Although more than two years have passed since plaintiffs' decedent was killed on December 15, 1983, the Georgia Legislature enacted a statute which allows plaintiffs six months in which to refile their action in state court. The Georgia Code provides in part:

> When any case has been commenced in either state or federal court within the applicable statute of limitations and the plaintiff discontinues or dismisses the same, it may be recommenced in a court of this state ... either within the original applicable period of limitations or within six months after the discontinuance or dismissal, whichever is later.

Ga. Off'l Code Ann. § 9–2–61 (Supp.1986).

Although the section was at one time ruled as inapplicable to actions which originated in federal court (see *Blaustein v. Harrison,* 160 Ga.App. 256, 286 S.E.2d 758 (1981)), the section was amended in 1985 to specifically allow a refiling in state court following the dismissal of an action originally commenced in federal court. Moreover, while on its face the statute allows refiling only where the plaintiff dismisses the original action, the Georgia courts have repeatedly held that the section "applies to involuntary as well as voluntary dismissals where the merits are not adjudicated." *Fowler v. Aetna Casualty & Surety Co.,* 159 Ga.App. 190, 192, 283 S.E.2d 69 (1981) (*quoting Bowman v. Ware,* 133 Ga.App. 799, 800, 213 S.E.2d 58 (1975)). *See also, Douglas v. Kelley,* 116 Ga.App. 670, 158 S.E.2d 441 (1967) ("A dismissal of the case by the court on a ground not adjudicating the merits counts as a voluntary dismissal for this purpose.").

In ruling that plaintiffs' section 1983 claim fails as a matter of law, this court does not reach the merits of plaintiffs' pendent state law claims. Thus, under Ga. Off'l Code Ann. § 9–2–61, plaintiffs may renew their state law claims in state court within six months of the dismissal of their claims by this court. For purposes of plaintiffs state law claims, the merits of which this court has not adjudicated, the statute of limitations was effectively tolled on the date they filed their complaint in federal court. That date was two days before the statute of limitations had run on their wrongful death and medical malpractice claims. In light of the *Gibbs* directive and the opportunity for plaintiffs to renew the state law causes of action in state court pursuant to Ga. Off'l Code Ann. § 9–2–61, the court DISMISSES WITHOUT PREJUDICE Counts II–IV.

In summary, the court:

(1) GRANTS defendants' motion for summary judgment on Count I of plaintiffs' complaint and hereby DISMISSES Count I WITH PREJUDICE; and

(2) DECLINES to reach the merits of plaintiffs' pendent state law claims set forth in Counts II–IV and hereby DISMISSES Counts II–IV WITHOUT PREJUDICE.